**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>   SELIM DAVID MOCHE,<br><br>                                    Debtor. | **FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 25-11831 (JPM) |

***APPEARANCES***

**PICK & ZABICKI LLP**
*Counsel for the Debtor*
369 Lexington Avenue, 12th Floor
New York, NY 10017
By:    Douglas J. Pick
         Eric Zabicki

**WEINBERG ZAREH MALKIN PRICE LLP**
*Counsel for Creditor Nancy Wolfson*
45 Rockefeller Plaza, 20th Floor
New York, NY 10111
By:    Adrienne Woods

**ROACH & LIN, P.C.**
*Counsel for Creditor Ridgewood Savings Bank*
6851 Jericho Turnpike, Suite 185
Syosset, NY 11791
By:    Jacqueline M. Kelly

**UNITED STATES TRUSTEE**
*Office of the U.S. Trustee, Region 2*
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
By:    Andrea Beth Schwartz

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO RETAIN REAL
ESTATE BROKER; GRANTING STAY RELIEF TO RESUME MATRIMONIAL
PROCEEDING; AND DENYING STAY RELIEF TO PROCEED WITH FORECLOSURE**

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

This is the Chapter 11 case of the debtor Selim David Moche (the "**Debtor**").  Before the

Court are three motions:

> (1) the Debtor's motion to retain Corcoran Group ("**Corcoran**") as a real estate
>     broker to arrange a sale of the Debtor's asserted interest in his former marital
>     residence (the "**Retention Motion**"), dated October 20, 2025 (Dkt. No. 24);
> (2) the motion of Nancy Wolfson-Moche ("**Ms. Wolfson**"), the Debtor's separated
>     spouse and an unsecured creditor, for relief from the automatic stay to resume
>     the parties' matrimonial proceeding in state court ("**Ms. Wolfson's Stay Relief
>     Motion**"), dated December 1, 2025 (Dkt. No. 39); and
> (3) the motion of Ridgewood Savings Bank (the "**Bank**"), a secured creditor
>     holding a mortgage on the Debtor's former marital residence, for relief from the
>     automatic stay to allow the Bank to proceed with foreclosure (the "**Bank's Stay
>     Relief Motion**"), dated December 3, 2025.  (Dkt. No. 40).

On November 6, 2025, Ms. Wolfson objected to the Retention Motion, arguing that the

Debtor cannot sell property that he does not own (the "**Objection**").  (Dkt. No. 31).  The Debtor

filed a response on November 10, 2025, asserting that he seeks only to retain Corcoran to identify

a prospective buyer, not to consummate a sale.  (Dkt. No. 32).  The Court held a hearing on

November 13, 2025 (the "**Retention Hearing**").  (*See* Nov. 13, 2025 Hr'g Tr.).

On February 2, 2026, the Debtor filed a response to Ms. Wolfson's Stay Relief Motion (the

"**Response**"), contending that Ms. Wolfson filed the motion solely to frustrate the Debtor's efforts

to reorganize and has failed to demonstrate "cause" for stay relief.  (Dkt. No. 53).  Ms. Wolfson

filed a reply on February 9, 2026 (the "**Reply**") and an amended reply on February 10, 2026 (the

"**Amended Reply**").  (Dkt. Nos. 55, 56).

Also on February 2, 2026, the Debtor filed an opposition to the Bank's Stay Relief Motion

(the "**Debtor's Opposition**"), arguing that stay relief is unwarranted because the Debtor has

substantial equity in the property and there is no risk of diminution in the value of the Bank's lien.

2

(Dkt. No. 52). On February 3, 2026, Ms. Wolfson also filed an opposition to the Bank's Stay Relief Motion, arguing that stay relief is unwarranted given the property's substantial equity cushion and further asserting that the Debtor is responsible for paying any post-petition arrears to the Bank. (Dkt. No. 54). The Court held another hearing on February 10, 2026 (the "**Stay Relief Hearing**"). (*See* Feb. 10, 2026 Hr'g Tr.).

The Court has reviewed the parties' submissions, the arguments presented at the Retention Hearing and the Stay Relief Hearing, and the record as a whole. For the reasons set forth below, the Court **DENIES** the Debtor's Retention Motion, **GRANTS** Ms. Wolfson's Stay Relief Motion, and **DENIES** the Bank's Stay Relief Motion.

## II.   <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), 157(b)(1), and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G), and (O).

## III.   <u>BACKGROUND</u>

### A.  THE NEW YORK MATRIMONIAL PROCEEDING

This bankruptcy case arises from a long-running matrimonial dispute and involves the parties' marital residence and the Debtor's alleged noncompliance with his spousal support obligations ordered by the state matrimonial court.

The Debtor and Ms. Wolfson were married in 1998 and jointly owned residential cooperative units located at 525 East 89th Street, Units 1K and 2K, New York (the "**Property**"), which served as their marital home. (Dkt. Nos. 24, 31, 32). On December 9, 2021, Ms. Wolfson commenced a divorce proceeding in the Supreme Court of the State of New York, New York

County (the "**New York Court**").  *See Nancy Wolfson-Moche v. S. David Moche*, No. 365568-
2021 (Sup. Ct. N.Y. County, filed Dec. 9, 2021) (the "**Matrimonial Proceeding**").

While the Matrimonial Proceeding was pending, the Debtor vacated the Property.  (Dkt.
No. 1, Schedule G).  Ms. Wolfson remained in the Property with their younger daughter.[1]  (Dkt.
No. 31).  Following the parties' separation, Ms. Wolfson has earned her living as a home nutrition
educator and teaches cooking lessons from the Property.  (*See* Declaration of Nancy Wolfson, Dkt.
No. 31, ¶ 14).

Beginning in February 2023, the New York Court entered a series of orders directing the
Debtor to pay spousal support, child support, and the carrying costs associated with the Property.
(*Id.*).  On February 27, 2023, based on Ms. Wolfson's self-reported annual income of $25,461 and
the Debtor's self-reported annual income of $200,000, the New York Court ordered the Debtor to
pay $2,533 per month in spousal support, $1,704 per month in child support, and 73.79% of other
family expenses.  (*Id.* Exhibit 1).  The New York Court further ordered the Debtor to pay the
mortgage, maintenance, real estate taxes, utilities, insurance, and other carrying costs for the
Property, and granted Ms. Wolfson rights of exclusive use and occupancy. (*Id.*).  The Debtor failed
to comply, claiming inability to pay.  (*Id.*).

On June 1, 2023, the New York Court reaffirmed the Debtor's obligation to pay the
mortgage and related carrying costs.  (*See* Declaration of Nancy Wolfson, Dkt. No. 31, ¶ 38).  The
New York found that the Debtor had not been forthcoming regarding his financial condition and
determined that he was able to comply with the February 27, 2023 order.  (*Id.* ¶ 39).  The New
York Court also awarded Ms. Wolfson $50,000 in court costs and attorney fees.  (*Id.* Exhibit 1).

---

[1]    The parties have two daughters.  According to Ms. Wolfson's declaration, the Property serves as the primary
residence of the younger daughter, who was a college freshman at the time of the filing, and as the home base for the
elder daughter, who works in Atlanta, Georgia, and returns home at least once a month.  (*See* Declaration of Nancy
Wolfson, Dkt. No. 31, ¶¶ 10-11, 14-15).

The Debtor again allegedly failed to pay, resulting in a mortgage default and the commencement of foreclosure proceedings against the Property.  (*Id*.).

On April 26, 2024, the New York Court ordered the Debtor to "liquidate $500,000[,] bring the [Property] out of foreclosure, [and] pay all the outstanding maintenance [and carrying costs] … by May 2, 2024."  (*Id*. Exhibit 2).  The Debtor did not comply.  Ms. Wolfson thereafter moved to hold the Debtor in civil contempt.  (*See* Declaration of Nancy Wolfson, *Id*. ¶ 48).

On June 30, 2025, the New York Court found the Debtor in willful contempt for violating the court's prior orders and directed him to cure all outstanding amounts, plus late fees, by July 9, 2025.  (*Id*. Exhibit 3).  A contempt hearing was scheduled for September 9, 2025.  (*Id*.).

## B.  THE CHAPTER 11 PETITION AND ADVERSARY PROCEEDING

On August 21, 2025—approximately two weeks before the scheduled contempt hearing— the Debtor filed a voluntary petition for Chapter 11 relief in this District.  (Dkt. No. 1).  The filing triggered an automatic stay of all actions in the Matrimonial Proceeding, including enforcement of the New York Court's June 30, 2025 contempt order.  (*See* Declaration of Nancy Wolfson, Dkt. No. 31, ¶ 13).

The Debtor's schedules list Ms. Wolfson both as a creditor holding a $25,421 unsecured claim and as a co-debtor on the mortgage.  (Dkt. No. 1, Schedules E/F, H).  The Debtor's asserted interest in the Property—which is valued at $2,700,000 in the aggregate, or $1,350,000 for his purported 50% share—is his principal asset.  (*Id*. Schedule A/B).  The Debtor's schedules also indicate that the Property is encumbered by a $56,129 lien held by the cooperative association for unpaid maintenance fees and a $437,850 secured debt outstanding owed to the Bank, for which the Debtor and Ms. Wolfson are allegedly jointly liable as co-debtors.  (*Id*. Schedule D).

On September 12, 2025, the Debtor commenced an adversary proceeding against Ms. Wolfson, seeking authority under 11 U.S.C. § 363(h) to sell the Property free and clear of Ms. Wolfson's interest and distribute the proceeds according to the parties' respective rights. *See Moche v. Wolfson-Moche*, No. 25-01136 (Bankr. S.D.N.Y. filed Sept. 12, 2025) (Adv. Proc. Dkt. No. 1) (the "**Adversary Proceeding**"). The Debtor asserts that a partition in kind is impracticable because he holds an "undivided interest" as a "tenant by the entirety," and that a partition by sale is necessary to recover assets for the estate. (*Id.* ¶¶ 8, 17-20).

On October 15, 2025, Ms. Wolfson filed an answer disputing the Debtor's allegations and opposing the proposed § 363 sale. (Adv. Proc. Dkt. No. 4). Ms. Wolfson denies that she is a co-debtor, arguing that the New York Court has determined that "she is the rightful owner of 100% of the [Property] … and has a lien against 100% of the [Debtor's] purported share in the Property." (*Id.* ¶ 8). She further asserts that her claim against the Debtor is approximately $375,000 (plus over $66,000 in accrued interest, late fees, and legal costs) based on the New York Court's orders in the Matrimonial Proceeding, rather than $25,421 as scheduled by the Debtor. (*Id.* ¶ 11).

On December 16, 2025, Ms. Wolfson filed an *ex parte* application seeking authority to issue subpoenas pursuant to Bankruptcy Rule 2004, which the Court granted that same day. (Dkt. Nos. 43, 44). Affidavits of service regarding the Rule 2004 subpoenas were filed on January 14, 2026. (Adv. Proc. Dkt. No. 6). According to the Debtor, Ms. Wolfson issued more than 25 subpoenas, including subpoenas directed to several of the Debtor's friends, relatives, and various banks and financial institutions. (Dkt. No. 53, ¶ 22). The record does not reflect that any motions to quash were filed in response to those subpoenas.

On February 2, 2026, Ms. Wolfson moved to stay discovery in the Adversary Proceeding pending resolution of her Stay Relief Motion in the main bankruptcy case (the "**Motion to Stay**

6

**Discovery**").  (Adv. Proc. Dkt. No. 8).  The Debtor opposed the Motion to Stay Discovery on February 16, 2026.  (Adv. Proc. Dkt. No. 10).  Following a hearing on February 27, 2026, the Court granted the Motion to Stay Discovery by order on March 3, 2026.  (Adv. Proc. Dkt. No. 13).

## IV.  <u>LEGAL ANALYSIS</u>

### A.  THE RETENTION MOTION

#### 1.  Legal Standard

The threshold issue is whether retention of a real estate broker is warranted.  Section 327(a) of the Bankruptcy Code authorizes a debtor-in-possession, with court approval, to "employ professionals," including real estate brokers, "to represent the debtor or assist in carrying out its duties, provided they are disinterested and do not hold or represent an interest adverse to the estate."  *In re Silberman*, 605 B.R. 631, 642 (Bankr. S.D.N.Y. 2019) (citing 11 U.S.C. § 327(a)); *see also In re Nine West Holdings, Inc.*, 588 B.R. 678, 693 (Bankr. S.D.N.Y. 2018); *accord In re Northeast Dairy Co-op. Federation, Inc.*, 72 B.R. 149, 153 (Bankr. N.D.N.Y. 1987) (holding that licensed real estate brokers are "professionals" within the meaning of § 327(a)).  Section 328(a) permits a court to reexamine or adjust the terms of such employment, including compensation, if those terms "prove to have been improvident in light of new developments that could not have been anticipated earlier."  *In re Tyson*, No. 03-41900 (ALG), 2005 WL 3789356, at *6 (Bankr. S.D.N.Y. June 3, 2005).

Whether to approve a debtor's retention of professionals lies within the bankruptcy court's discretion.  *See In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999). In exercising that discretion, courts consider the "particular facts and circumstances surrounding each case[.]"  *In re Diva Jewelry Design, Inc.*, 367 B.R. 463, 471 (Bankr. S.D.N.Y. 2007).  Relevant factors include "the protection of the interests of the bankruptcy estate and its creditors, and the efficient,

expeditious, and economical resolution of the bankruptcy proceeding." *In re Vouzianas*, 259 F.3d

103, 107 (2d Cir. 2001).  If retention of a real estate broker is approved, the "[b]ankruptcy estate—

not the property owner—is the client." *In re Aller*, 649 B.R. 662, 665 (Bankr. W.D. Pa. 2023).  As

such, "a broker must affirmatively communicate substantive developments in the sale process to

estate professionals and, if necessary, the court."  *Id*.; *see also In re Southampton Brick and Tile,

LLC*, No. 11-75928, 2012 WL 4850048, at *4 (Bankr. E.D.N.Y. Oct. 11, 2012); *In re Leslie Fay

Companies, Inc*., 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994).

### 2.  The Parties' Arguments

Ms. Wolfson objects to the Retention Motion on three grounds.  First, she contends that the

Retention Motion is premature because granting it would effectively require the Court to determine

the Debtor's authority to sell the Property—a fact-intensive inquiry currently pending in the

Adversary Proceeding.  (Dkt. No. 31, ¶ 2).  That proceeding remains in the pleading stage.  As set

forth above, the Court has granted Ms. Wolfson's Motion to Stay Discovery, and the Court has not

yet entered a scheduling order for an evidentiary hearing.[2]  (*Id*. ¶ 6).  Until the Debtor's interest (if

any) is adjudicated, Ms. Wolfson argues, the Debtor lacks authority to enter into a brokerage

agreement for the Property.  (*Id*.).

Second, Ms. Wolfson argues that premature retention of a broker would cause substantial

harm to her and her daughter, who continue to reside at the Property.  (*Id*. ¶ 12).  Ms. Wolfson fears

that, if a broker is retained now, "the Debtor will cause the broker to unreasonably and excessively

seek access to the [P]roperty" or "bring prospective buyers unannounced," in violation of her right

to exclusive use and occupancy.  (*Id*. ¶ 16).  Thus, contrary to the Debtor's assertion that retention

---

[2]    At the time the Retention Motion was filed, no formal discovery had taken place in either the main bankruptcy
case or the Adversary Proceeding.

would poses "no harm" and only maximize the estate value, Ms. Wolfson maintains that she—allegedly the largest unsecured creditor—would be prejudiced.  (*Id*.).

Third, Ms. Wolfson argues that the Debtor has no right to sell the Property.  She contends that, to the extent the Debtor claims a 50% interest, that claim is barred by "*res judicata*, collateral estoppel, or the 'law of the case' doctrine" because the New York Court has already determined in the Matrimonial Proceeding that Ms. Wolfson owns 100% the Property.  (*Id*. ¶ 39) (citing *Jancu v. Jancu*, 174 A.D.2d 428, 428 (N.Y. App. 1st Dept. 1991) and *Delvito v. Delvito*, 6 A.D. 3d 487, 488-89 (N.Y. App. 2d Dept. 2004)).  She further argues that even a "mere" brokerage agreement is prejudicial because it mischaracterizes the Debtor as an owner with the authority to sell, thereby undermining her rights.  (*Id*. ¶ 49).

The Debtor rejects each argument.  Regarding Ms. Wolfson's first argument, the Debtor argues that the Adversary Proceeding does not bar the Retention Motion because he seeks only to retain Corcoran to solicit a prospective buyer, not to sell the Property at this juncture.  (Dkt. No. 32, at 2).  Regarding the second argument, the Debtor asserts the benefits of broker retention outweigh any harms to Ms. Wolfson, since a sale would increase estate value and is "anticipated to generate $1 million to Ms. Wolfson."  (*Id*. at 3).  As to the third argument, the Debtor contends that this Court is not bound by the Matrimonial Proceeding because §§ 327(a) and 328(a) only require that a broker be a "disinterested professional" retained "on reasonable terms."  (Dkt. No. 24, ¶¶ 7-10).  The Debtor argues that he satisfied the statutory requirements because Corcoran is an "internationally known, top-level brokerage" and the agreement was negotiated at arm's length.  (*Id*. ¶ 9).  The Debtor further argues that, even if he sought a sale now, he could do so as debtor-in-possession under § 363(h) because "all legal and equitable interests" became property of the estate upon a Chapter 11 filing.  (Dkt. No. 32, at 4).

### 3.   The Circumstances Weigh Against Retention of a Real Estate Broker

There is no dispute that the minimum statutory requirements of §§ 327(a) and 328(a) are satisfied.  Ms. Wolfson does not contest Corcoran's ability to conduct a sale in a disinterested and professional manner and she is not claiming that Corcoran's interests are not aligned with that of the estate.  The key question on this issue is whether, given the particular facts and circumstances here, retention is warranted, notwithstanding that Corcoran is a disinterested, non-adverse professional within the meaning of § 327.  The Court finds that the facts and circumstances weigh against retention.

The Court agrees with Ms. Wolfson that the Retention Motion is procedurally premature. It is well established in the Second Circuit that courts "may delay ruling on [a] matter until [it] is ripe for determination or deny the motion without prejudice[.]" *United States v. Yalincak*, 853 F.3d 629, 641 (2d Cir. 2017); *In re Methyl Tertiary Butyl Ether Products Liability Litigation*, 364 F.Supp.2d 329, 331 n.4 (S.D.N.Y. 2004).  That general principle also applies in bankruptcy. *See, e.g.*, *In re Golden*, 630 B.R. 896, 913 (Bankr. E.D.N.Y. 2021).  For instance, where the relief requested overlaps with issues being litigated in a pending adversary proceeding, courts generally deny relief without prejudice or defer ruling until those issues are resolved.  *See In re Slater*, No. 095-70848-511, 1996 WL 699719, at *11 (Bankr. E.D.N.Y. Aug. 1, 1996) (deferring ruling on a motion to dismiss pending resolution of a related issue in the adversary proceeding); *see also Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231, 249 (S.D.N.Y. 2006) (denying motion as premature where it sought "resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action").

Here, the Debtor's request to retain a real estate broker necessarily overlaps with issues pending resolution in the Adversary Proceeding.  The Debtor's complaint asserts a "one-half

undivided interest" in the Property and seeks authority to sell it under § 363(h).  (Adv. Proc. Dkt. No. 1, ¶¶ 16-20).  But before any sale may proceed, the Court (and/or the New York Court) must determine whether the Debtor holds any cognizable interest in the Property such that it constitutes "property of the estate."  As the Court explained in *Ditech*, "a bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the property is property of the estate."  *In re Ditech Holding Corporation*, 606 B.R. 544, 596 (Bankr. S.D.N.Y. 2019) (quoting *In re Whitehall Jewelers Holdings, Inc*., No. 08-11261 (KG), 2008 WL 2951974, at *4 (Bankr. D. Del. July 28, 2008)).  The United States Supreme Court has likewise held that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy" and that "[a] debtor's property" neither shrinks nor expands "by happenstance of bankruptcy."  *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019).  Thus, regardless of whether "all legal and equitable interests" of the debtor become property of the estate upon filing, that does not answer the threshold question presented here: whether—and to what extent—the Debtor has any such interest in the Property in the first place.  (Dkt. No. 32) (citing 11 U.S.C. § 363(h)).

That threshold determination is the predicate issue underlying the Retention Motion.  The Debtor seeks to retain a broker to solicit prospective buyers for property for which his ownership interest—if any—has not yet been established.  (Dkt. No. 24).  Nor does the record establish that the Property—or any portion of it—constitutes property of the estate.  *See Ditech*, 606 B.R. at 596; *see also Mission Product*, 587 U.S. at 381.  Approving retention at this stage would therefore risk implying that the Debtor has authority to market and sell the Property, which could prejudice Ms. Wolfson's asserted rights while the central ownership dispute remains unresolved.  That concern is heightened because the Adversary Proceeding remains at the pleading stage, and no evidentiary hearing has been scheduled.  (Dkt. No. 31, ¶ 6).  Under these circumstances, retention is premature

and would improperly short-circuit the orderly adjudication of the parties' respective rights in the Adversary Proceeding (or in the Matrimonial Proceeding).

To the extent the Debtor argues that the pendency of the Adversary Proceeding does not bar the Retention Motion because he may separately arrange a future sale through a broker, regardless of whether he has a present right to sell, the Court is unpersuaded. The Debtor cites no legal authority for the proposition that a debtor may retain a broker to market and sell property before establishing a cognizable interest or showing that it constitutes property of the estate. In fact, existing case law suggests otherwise. Courts have consistently held that a debtor may not use, sell, or otherwise dispose of property that is not property of the estate. *See, e.g.*, *In re Shao Ke*, No. 09-32272, 2012 WL 2974754, at *2 (Bankr. N.D.N.Y. July 20, 2012); *In re Genger*, No. 19-13895 (JLG), 2024 WL 4438857, at *16 (Bankr. S.D.N.Y. Oct. 5, 2024) (holding that a trustee or debtor-in-possession "may only sell what belongs to the bankruptcy estate"). A party's authority to engage a broker for conveyance of real property is incident to ownership, and an owner cannot bind a co-owner in a contract for sale without obtaining that co-owner's consent. *See, e.g.*, *Tebedo v. Nye*, 256 N.Y.S.2d 235, 236 (Sup. Ct. Onondaga County, 1965) ("The power to convey real estate is an incident of ownership."); *Kwang Hee Lee v. ADJMI 936 Realty Associates*, 46 A.D.3d 629, 631 (N.Y. App. 2d Dept. 2007) (holding that a co-owner does not have authority to execute a contract to sell property on behalf of another co-owner against that co-owner's consent); *Valentine v. Healey*, 178 N.Y. 391, 399 (N.Y. 1904) (holding that a tenant "cannot bind a co-tenant without his consent by a contract or a lease with reference to the property of which they are the owners"). The Debtor has neither established an ownership interest that would confer authority to convey, nor obtained consent from Ms. Wolfson to act on her behalf.

Broker retention is unwarranted for the additional reason that the Debtor's asserted interest is premised on a tenancy by the entirety arising from a marriage that has not yet been dissolved. Under New York law, married couples are presumed to own property as tenants by the entirety, and "neither tenant … can sever the tenancy except with the consent of the other spouse or through a judicial dissolution of the marriage." *See In re Martin*, No. 13-70064, 2013 WL 3956384, at *2 (Bankr. E.D.N.Y. Jul. 25, 2013) (citing *Goldman v. Goldman*, 95 N.Y.2d 120, 122 (N.Y. 2000)). Because the Matrimonial Proceeding is stayed and the divorce has not yet been finalized, the parties' tenancy by the entirety has not been severed. *See Stewart v. Stewart*, 118 A.D.2d 455, 457 (N.Y. App. 1st Dept. 1986) ("[U]nless a court alters the legal relationship of a husband and wife by granting a divorce, an annulment, a separation or by declaring a void marriage a nullity, it has no authority to order the sale of a marital home owned by the parties as tenants by the entirety."). Absent a determination that the Debtor holds a cognizable interest in the Property, or consent from Ms. Wolfson, the Debtor lacks authority to enter into a brokerage agreement that contemplates sale of the Property.  Thus, unless and until the parties' rights to the Property are adjudicated on the merits, the Debtor may not retain Corcoran as a real estate broker.

## B.  MS. WOLFSON'S STAY RELIEF MOTION

### 1.  Legal Standard

The Court next considers whether Ms. Wolfson is entitled to stay relief to resume the Matrimonial Proceeding in the New York Court.  Section 362(d)(1) of the Code permits a party in interest, "after notice and a hearing," to seek "relief from the automatic stay."  11 U.S.C. § 362(d)(1); *In re Schuessler*, 386 B.R. 458, 479 (Bankr. S.D.N.Y. 2008).  Upon that party's motion, a bankruptcy court may, "for cause," terminate, annul, condition, or modify the stay.  *In re Cole*, 202 B.R. 356, 360 (Bankr. S.D.N.Y. 1996) (citing 11 U.S.C. § 362(d)).

The Code does not define "cause."  Instead, courts retain discretion to determine whether "cause" exists "on a case-by-case basis."  *In re AMR Corp.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013); *see also Spencer v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 110 (2d Cir. 2002). Where a movant seeks relief to proceed with pending litigation in another forum, courts in the Second Circuit apply the factors articulated in *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990).  Those factors are:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) the impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.

Not all of the *Sonnax* factors are relevant in every case, and the Court need not give equal weight to each factor.  *See Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999); *see also Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)*, 183 B.R. 682, 688 (S.D.N.Y. 1994).  Rather, "[w]hen applying these factors and considering whether to modify the automatic stay, the Court should take into account the particular circumstances of the case, and ascertain what is just to the claimants, the debtor and the estate."  *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994); *see also In re Touloumis*, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994).

### 2.  The Parties' Arguments

Ms. Wolfson seeks relief from the automatic stay to resume the Matrimonial Proceeding. (Dkt. No. 39).  Relying on *In re Cole*, 202 B.R. 356 (Bankr. S.D.N.Y. 1996), and *In re Kalsi*, No.

14

20-10330 (MG), 2020 Bankr. LEXIS 912 (Bankr. S.D.N.Y. Mar. 31, 2020), Ms. Wolfson argues that Courts in this District routinely grant stay relief to permit matrimonial actions to proceed where the parties' respective interests in marital property remain unresolved. (*Id*. ¶¶ 39-47). She contends that *Cole* presented a "near identical" scenario: the debtor failed to comply with the state court's spousal support orders and filed for bankruptcy before equitable distribution was adjudicated. (*Id*. ¶ 39). The *Cole* court granted the non-debtor spouse stay relief, noting that "bankruptcy courts ordinarily defer to the state courts in matrimonial matters" because state courts are "more familiar with the concepts of marital property and how to apply the statutory and discretionary factors that govern equitable distribution[.]" (*Id*. ¶ 41) (quoting *Cole*, 202 B.R. at 361).

Ms. Wolfson argues that *Kalsi* reinforces the same principle. There, the court granted stay relief to allow continuation of a divorce action. *See Kalsi*, 2020 Bankr. LEXIS 912, at *8. The *Kalsi* court observed that "New York matrimonial courts have long been empowered … to determine the issues of title to property and to make directions pertaining to the possession of property" in connection with divorce proceedings. *Id.* (citing *Cole*, 202 B.R. at 362). In Ms. Wolfson's view, *Cole* and *Kalsi* confirm that the determination and liquidation of marital property rights belong in the state matrimonial forum, while the bankruptcy court retains authority over the administration and distribution of estate property. (Dkt. No. 39).

The Debtor objects, arguing that Ms. Wolfson misreads *Cole* and *Kalsi*. (Dkt. No. 53). The Debtor contends that *Cole* acknowledges the bankruptcy court's exclusive jurisdiction over distribution of estate property and cautions that "sending the parties back to state court to litigate … equitable distribution may interfere with the administration of [estate] property" and "prejudice creditors." (*Id*. ¶ 18) (quoting *Cole*, 202 B.R. at 361). The Debtor further argues that *Kalsi* is

15

distinguishable because Ms. Wolfson has "already chosen to proceed with discovery in this Court" in the Adversary Proceeding.  (Dkt. No. 53, ¶ 22).  In his view, granting stay relief would "simply result in duplicat[ive] discovery" and waste of judicial resources, rather than promoting efficiency. (*Id*.).

In response, Ms. Wolfson maintains that the Debtor misconstrues both cases.  (*See* Reply, Dkt. No. 56).  Ms. Wolfson reiterates that she does not seek to enforce any judgment against estate property at this juncture, but only to permit the matrimonial court to "determine support obligations and allocate marital rights"—matters within the specialized expertise of state matrimonial courts. (*Id*. ¶ 3).  She emphasizes that the determination of marital property rights is a "quintessential family law" issue for which "bankruptcy courts do not develop [comparable] expertise," and argues that "domestic relations matters are expressly excluded from federal jurisdiction under 28 U.S.C. § 1334(c)(2).  (*Id*.).  Ms. Wolfson further asserts that granting stay relief would not divest this Court of control over estate property.  (*Id*. ¶ 10).  Rather, she contends that the matrimonial court may adjudicate the parties' marital property rights, while this Court retains exclusive authority to supervise any sale and to control the ultimate distribution of estate assets.  (*Id*.).

### 3.  A Majority of the *Sonnax* Factors Weigh In Favor of Lifting the Stay

In determining whether "cause" for stay relief exists, the Court applies the *Sonnax* factors. *See Sonnax*, 907 F.2d at 1286.  The third, fifth, sixth, eighth, and ninth factors are inapplicable here: the Debtor is not acting as a fiduciary; no insurer is involved; the Matrimonial Proceeding does not primarily involve third parties; and any determination by the state court concerning equitable distribution will neither implicate equitable subordination nor result in a judicial lien avoidable by the Debtor.  *See id*.  Therefore, the Court focuses on the first, second, fourth, seventh, tenth, eleventh, and twelfth factors.

16

### *First Factor: Partial or Complete Resolution of the Issues*

The Court finds that the first factor weighs in favor of lifting the stay. In assessing this factor, courts consider whether permitting the non-bankruptcy litigation to proceed would resolve the issues between the parties, either in whole or in part, and thereby streamline the bankruptcy case. *See Bogdanovich*, 292 F.3d at 113 (finding stay relief appropriate where allowing pending state court litigation to proceed would resolve issues in the adversary proceeding completely and with "some certainty"); *see also Chen & Ju, Inc. v. Zhang*, No. 18-1005 (MAD), 2019 WL 1284252, at *1 (N.D.N.Y. Mar. 28, 2019) (observing that "[n]o purpose is served" by continuing the automatic stay "when all claims between the Debtor and all of its creditors will be finally resolved before this Court and would be dispositive of all bankruptcy claims").

Here, granting stay relief would permit the New York Court to determine the parties' respective interests in the Property and adjudicate any support obligations. Those determinations would materially narrow the disputes before this Court by fixing the amount and nature of the Debtor's and Ms. Wolfson's rights under state law. In particular, the threshold question of whether—and to what extent—the Property constitutes property of the estate depends upon the New York Court's resolution of the parties' marital interests. Until those interests are defined, this Court cannot definitively determine the scope of the estate. *See In re Hohenberg*, 143 B.R. 480, 485 (Bankr. W.D. Tenn. 1992) ("Until the state court classifies and equitably divides the marital property, what is property of the bankruptcy estate is unclear."); *see also In re Sapp*, 655 B.R. 421, 434 (Bankr. D.S.C. 2023) ("Until equitable distribution is accomplished, this Court is unable to discern not only the interest of the Debtor in the Property but also his interest in other estate assets.").

Once equitable distribution is complete, the parties' respective interests in estate property may be administered through, for instance, this Court's claims allowance and distribution process. *See In re Taub*, 417 B.R. 186, 196 (Bankr. E.D.N.Y. 2009) ("This Court would retain jurisdiction to … administer any judgment against the Debtor through the claims allowance process."). Allowing the Matrimonial Proceeding to continue will therefore clarify the scope of the estate and reduce uncertainty for further administration of the case. Rather than complicating the Debtor's bankruptcy, it will promote an orderly and efficient resolution of the parties' disputes. Accordingly, this factor weighs in favor of stay relief.

### Second Factor: Lack of Interference with the Bankruptcy Case

The second factor likewise weighs in favor of lifting the stay. In evaluating this factor, courts consider whether continuation of the non-bankruptcy proceeding would intrude upon the bankruptcy court's authority over estate property or otherwise disrupt the orderly administration of the case. *See In re Crichlow*, 666 B.R. 441, 457 (Bankr. E.D.N.Y. 2024) (finding the second *Sonnax* factor weighed in favor of stay relief where permitting a foreclosure sale in state court would not interfere with the debtor's bankruptcy); *see also In re David X. Manners Company Inc*., No. 15-51490 (JJT), 2018 WL 1997674, at *6 (Bankr. D. Conn. Apr. 26, 2018) (observing that, although the state court action was "connected" to the bankruptcy case "insomuch as the resolution of issues in the former affect certain determinations in the latter," relief would "by no means interfere with the bankruptcy case").

The Court finds that lifting the stay would not improperly interfere with the Debtor's bankruptcy. The Debtor argues that returning to state court to litigate equitable distribution would intrude upon this Court's exclusive jurisdiction over the property of the estate. (Dkt. No. 53). But Ms. Wolfson seeks only a determination of marital property rights—not enforcement against estate

18

property.  (*See* Reply, Dkt. No. 56).  This Court retains exclusive authority over estate property and over the ultimate distribution of any sale proceeds.  Granting stay relief would therefore not divest this Court of control over estate property.

Although a state court's determination of equitable distribution may, in some cases, overlap with the bankruptcy court's exclusive jurisdiction over the administration of estate property, this is not such a case.  *See In re Teligent, Inc.*, 459 B.R. 190, 187 (Bankr. S.D.N.Y. 2011) ("While the [bankruptcy court] enjoys exclusive jurisdiction over property of the estate, it only enjoys nonexclusive jurisdiction over bankruptcy proceedings that may affect property of the estate."); *In re Ranu Realty Corp.*, No. 12 Misc. 409 (RA), 2013 WL 622171, at *6 (S.D.N.Y. Feb. 15, 2013) (noting that the bankruptcy court and the state court "shared concurrent jurisdiction over the proceedings that affected the property of the estate").  Here, the scope of estate property has not yet been defined.  The Debtor conflates the Court's exclusive jurisdiction over the disposition of estate property with the determination of the parties' underlying property interests.  *See In re Spiro*, 305 B.R. 142, 144 (Bankr. D. Conn. 2004) ("The debtor confuses this court's exclusive jurisdiction over the disposition of property of a bankruptcy estate with the nonexclusive jurisdiction to determine the definition of estate property.  Indeed, in the absence of contravening federal law, bankruptcy courts are obligated to look to state law to determine what, if any, interest an entity, including the debtor, has in property.").  As the Supreme Court has instructed in *Butner*, bankruptcy courts must look to state law to determine what interest, if any, the debtor holds in property.  *See Butner v. United States*, 440 U.S. 48, 54 (1979).  Permitting the New York Court to perform that state-law function will not usurp this Court's authority; it will operate in parallel with, and in support of, this Court's jurisdiction.  Accordingly, this factor favors stay relief.

***Fourth Factor: Specialized Tribunal***

The fourth factor strongly favors stay relief. Courts have long recognized that "domestic relations [matters] are best left to the state courts." *In re Friedberg*, No. 08-51245 (AHWS), 2009 WL 1292273, at *2 (Bankr. D. Conn. May 8, 2009) (citing *Sonnax*, 907 F.2d at 1286) (identifying as cause "whether a specialized tribunal with the necessary expertise has been established to hear the cause of action"); *see also Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992) (acknowledging state courts' "special proficiency" in matters of "divorce, alimony, and child custody"); *Rose v. Rose*, 481 U.S. 619, 625 (1987) (noting that federal courts have consistently recognized that "the whole subject of domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States"); *In re Ladak*, 205 B.R. 709, 712 (Bankr. D. Vt. 1997) (emphasizing the need for bankruptcy courts and matrimonial courts to "avoid incursions into the primary jurisdiction of [each] other").

The New York Court possesses specialized expertise in matrimonial matters. The New York Court routinely adjudicates equitable distribution, support, and marital property rights under New York Domestic Relations Law § 236. *See In re Greenwald*, 134 B.R. 729, 731 (Bankr. S.D.N.Y. 1991) (citing *Sperber v. Schwartz*, 139 A.D.2d 640, 642 (N.Y. App. 2d Dept. 1988)). As recognized in *Cole* and *Kalsi*, state matrimonial courts are uniquely equipped to determine the parties' respective interests in marital property and to apply the statutory and discretionary factors governing equitable distribution. *See Cole*, 202 B.R. at 361; *see also Kalsi*, 2020 Bankr. LEXIS 912, at *8. Bankruptcy courts, by contrast, do not ordinarily apply those standards and lack comparable institutional expertise in domestic relations matters. *See In re Levine*, 84 B.R. 22, 24 (Bankr. S.D.N.Y. 1988) (noting that the bankruptcy court "should not interfere with the state court's determination as to the New York law of equitable distribution as applied to the claims of

20

the debtor and his wife"); *accord Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992) (holding that "the bankruptcy court correctly placed equitable distribution disputes in the category of cases in which state courts have a special expertise and for which federal courts owe significant deference").  Thus, the principles of comity and respect for the state court's specialized expertise counsel strongly in favor of permitting the Matrimonial Proceeding to resume in the New York Court.

### *Seventh Factor: Prejudice to Other Creditors*

The seventh factor also favors stay relief.  This factor examines "whether litigation in another forum would prejudice the interests of other creditors."  *Sonnax*, 907 F.2d at 1286.  It reflects the concern that the determination of claims in another forum might "affect the interests of other creditors and property owners" or disrupt the Bankruptcy Code's priority scheme.  *In re Cloud Nine, Ltd.*, 3 B.R. 202, 204 (Bankr. D.N.M. 1980); *see also In re Taub*, 438 B.R. 39, 48 (Bankr. E.D.N.Y. 2010) (noting the risk that a state court might rule "without regard to the bankruptcy priority system or the rights of the other creditors").  For that reason, courts sometimes prefer to adjudicate disputes in "a forum in which all interested parties can participate."  *Musso v. Hirsch*, No. 08-4735 (CBA), 2011 WL 4543225, at *12 (E.D.N.Y. Sept. 29, 2011).

The Debtor contends that allowing the Matrimonial Proceeding to resume will prejudice creditors. (Dkt. No. 53, ¶ 15).  The Court disagrees.  Adjudication and liquidation of Ms. Wolfson's marital property rights will not alter the Code's priority scheme, nor will it permit enforcement against estate assets outside this Court's supervision.  (*See* Reply, Dkt. No. 56, ¶ 30).  The New York Court will determine the nature and extent of the parties' rights under applicable state law, and this Court will retain authority over claim allowance and distribution.  Creditors therefore

remain protected by this Court's continued control over estate property and by the claims allowance process. *See Taub*, 417 B.R. at 196. This factor favors stay relief.

### Tenth Factor: Judicial Economy

Judicial economy favors permitting the Matrimonial Proceeding to continue. In assessing this factor, courts consider whether allowing the action to proceed in another forum would promote the "expeditious and economical resolution of the litigation" and avoid unnecessary duplication or "unreasonable or unforeseeable delay" in the bankruptcy case. *In re Ice Cream Liquidation, Inc.*, 281 B.R. 154, 166 (Bankr. D. Conn. 2002) (quoting *Sonnax*, 907 F.2d at 1286); *see also In re Cicale*, No. 05-14462 (AJG), 2007 WL 1893301, at *4 (Bankr. S.D.N.Y. June 29, 2007).

The New York Court has presided over the Matrimonial Proceeding for several years and is already familiar with the parties, their finances, and the marital property. Requiring this Court to undertake an equitable distribution analysis under New York Domestic Relations Law would duplicate proceedings and expend judicial resources unnecessarily. The core issue—allocation of marital property and support obligations—falls squarely within the matrimonial court's expertise. *See, e.g.*, *Ankenbrandt*, 504 U.S. at 704; *Cole*, 202 B.R. at 361.

The Debtor argues that, because Ms. Wolfson has already served Rule 2004 subpoenas in the Adversary Proceeding, grating stay relief would "simply result in a duplication" of discovery in state court. (Dkt. No. 53, ¶ 22). The Court is unpersuaded. The Debtor's argument conflates discovery with adjudication. Discovery does not determine property rights; equitable distribution does. *See Pangea Capital Management, LLC v. Lakian*, No. 16-0840 (LAK), 2017 WL 4081911, at *5 (S.D.N.Y. Sept. 13, 2017) (noting that "equitable distribution can establish true property rights under state law"). The record reflects that discovery in the Matrimonial Proceeding has been substantially completed, and the only remaining issues for the New York Court to adjudicate

concern equitable distribution and dissolution of the marriage. (*See* Reply, Dkt. No. 56, ¶ 27). Thus, permitting the New York Court to complete that adjudication will not create duplication; it will bring the long-pending dispute to resolution.

Conversely, continuing discovery in the Adversary Proceeding while barring the New York Court from adjudicating marital rights would prolong uncertainty regarding the scope of the estate and increase administrative costs without meaningfully advancing the case towards confirmation. Based in part on these reasons, the Court recently granted Ms. Wolfson's request for a stay of discovery in the Adversary Proceeding pending resolution of Ms. Wolfson's Stay Relief Motion. (Adv. Proc. Dkt. No. 13). This factor therefore favors stay relief.

### Eleventh Factor: Readiness for Trial

The eleventh factor favors stay relief. This factor evaluates "whether the parties are ready for trial in the other proceeding." *Sonnax*, 907 F.2d at 1286. Although *Sonnax* uses the term "trial," courts have interpreted this factor more broadly to assess whether the non-bankruptcy litigation has reached an advanced stage such that allowing it to proceed would promote efficiency rather than duplication. *See In re Montague Pipeline Technologies Corp.*, 209 B.R. 295, 306 (Bankr. E.D.N.Y. 1997) (noting that "it is reasonable to conclude that the true inquiry under this factor is whether the litigation in question has reached an advanced stage"); *see also Finizie v. City of Bridgeport (In re Finizie)*, 184 B.R. 415, 419 (Bankr. D. Conn. 1995) (lifting the stay where state court proceedings had reached the "final judgment" stage). The purpose of this factor is to avoid restarting litigation in a new forum when the original proceeding is near resolution. *See, e.g.*, *In re Consolidated Distributors, Inc.*, No. 13-40350 (NHL), 2013 WL 3929851, at *11 (Bankr. E.D.N.Y. July 23, 2013).

The Matrimonial Proceeding has progressed to an advanced stage. As noted above, discovery in that proceeding has been substantially completed, and the remaining matters before the New York Court concern equitable distribution and dissolution of the marriage. Although not a conventional civil "trial," the equitable distribution hearing serves an analogous function: it culminates in a determination of the parties' property rights and results in a judgment. *See Cole*, 202 B.R. at 360 (citing New York Domestic Relations Law § 236) (noting that the state matrimonial court orders the "distribution of marital property" under equitable distribution "in the final divorce judgment"); *see also Sinha v. Sinha*, 285 A.D.2d 801, 803 (N.Y. App. 2d Dept. 2001) (explaining that a spouse's right to equitable distribution vests upon entry of the divorce judgment); *In re Brown*, No. 18-10617 (JLG), 2022 WL 4390454, at *10 (Bankr. S.D.N.Y. Sept. 22, 2022) ("The Judgment of Divorce is a final judgment on the merits that resolves all matters that were or could have been raised in the Matrimonial Action, including all those related to equitable distribution of the marital assets."). Allowing the New York Court to complete that process will bring the matter to resolution without requiring this Court to retrace or repeat years of litigation. Under these circumstances, the advanced posture of the Matrimonial Proceeding weighs in favor of stay relief.

### Twelfth Factor: Balance of Harms

The balance of harms also weighs in favor of stay relief. The final *Sonnax* factor examines "the impact of the stay on parties" and "raises similar considerations as those required in deciding whether to remand on equitable grounds." *Montague Pipeline*, 209 B.R. at 307*; see also Rahl v. Bande*, 316 B.R. 127, 135 (S.D.N.Y. 2004) (identifying relevant equitable factors, including the predominance of state law issues, judicial economy, involvement of non-debtors, relatedness of the state proceeding to the bankruptcy case, and the possibility of forum shopping). Courts have

described this factor as "one of the most important" in the *Sonnax* analysis. *See, e.g.*, *In re Motors Liquidation Co.*, No. 10-4322 (JGK), 2011 WL 2462773, at *2 (S.D.N.Y. June 20, 2011); *In re Lyondell Chemical Co.*, 402 B.R. 596, 610 (Bankr. S.D.N.Y. 2009).

Here, the automatic stay prevents Ms. Wolfson from obtaining a final adjudication of her equitable distribution and spousal support rights in the forum empowered to dissolve the marriage and allocate marital property. State law issues plainly predominate, and the Matrimonial Proceeding primarily concerns the rights of a non-debtor spouse. *See In re Residential Capital, LLC*, 488 B.R. 565, 577 (Bankr. S.D.N.Y. 2013) (finding state law issues predominate where the case primarily involves non-bankruptcy law); *Hirsch v. Kairey*, No. 22-6716 (EK), 2023 WL 4902749, at *4 (E.D.N.Y. Aug. 1, 2023) (quoting *Khalid v. Sessions*, 904 F.3d 129, 133 (2d Cir. 2018)) ("[F]amily law matters, including issues regarding child custody, child support, and alimony, implicate 'an area of law that federal courts and Congress leave almost exclusively to state law and state courts.'"). Continued enforcement of the stay would effectively delay resolution of core family law matters.

Although Ms. Wolfson contends that the stay has been "misused" to shield the Debtor from complying with state court orders, the Court need not resolve that contention to weigh this factor. (*See* Reply, Dkt. No. 56, ¶ 16). It is sufficient that the stay presently operates to halt adjudication of quintessential family law issues in the proper forum. The impact of the stay on Ms. Wolfson is concrete and ongoing.

By contrast, any potential harm to the Debtor or the estate can be mitigated by limiting stay relief to the determination of marital rights, with enforcement and distribution remaining subject to this Court's jurisdiction. *See In re Singe*, No. 23-60376 (PGR), 2023 WL 7211300, at *3 (Bankr. N.D.N.Y. Nov. 1, 2023) (finding that "stay relief may be granted to permit the matrimonial court

to decide … equitable distribution, but only up to the entry of judgment," and that the bankruptcy court would "retain jurisdiction to enforce [that] judgment"); *see also David X. Manners*, 2018 WL 1997674, at *6 ("Any risk to creditors here is addressed by limiting the scope of stay relief to allow the state court to determine the issues up to the entry of judgment, but not enforcement, so that the interests of creditors here are not harmed.").  Because the New York Court's determination will define, rather than dissipate, estate property, any potential prejudice to the estate is minimal. On balance, the equities favor stay relief.

Considering the particular circumstances of this case, the Court finds that a majority of *Sonnax* factors weigh in favor of lifting the stay to permit the Matrimonial Proceeding to continue.

## C.  THE BANK'S STAY RELIEF MOTION

### 1.  Legal Standard

Finally, the Court turns to the Bank's Stay Relief Motion.  Under § 362(d)(1), relief from the automatic stay is warranted where a creditor's interest in the debtor's property is not adequately protected.  *See In re Benton*, 662 B.R. 517, 521 (Bankr. S.D.N.Y. 2024).  The statute expressly identifies "the lack of adequate protection of an interest in property" as grounds for lifting the stay. 11 U.S.C. § 362(d)(1).

Section 361 sets forth non-exclusive means by which adequate protection may be provided, including: (i) periodic cash payments to compensate for any decrease in the value of the creditor's interest; (ii) the provision of additional or replacement liens; or (iii) other relief sufficient to provide the creditor with the "indubitable equivalent" of its interest.  *See* 11 U.S.C. § 361.  The purpose of adequate protection is to safeguard a secured creditor from "diminution in [the] value of [its] collateral" during the pendency of the stay.  *Bluebird Partners, L.P. v. First Fidelity Bank*, 896 F.Supp. 152, 154 (S.D.N.Y. 1995).

A debtor's failure to make required post-petition payments—whether mortgage payments or rent—can constitute "cause" to lift the stay and is "one of the best examples of a 'lack of adequate protection' under section 362(d)(1)." *Schuessler*, 386 B.R. at 481; *see also In re Taylor*, 151 B.R. 646, 648 (E.D.N.Y. 1993) ("[A] debtor's failure to make regular mortgage payments as they become due constitutes sufficient 'cause' to lift the automatic stay."); *In re Tihi Rest. Corp*., No. 22-11216 (JPM), 2023 WL 1768373, at *2 (Bankr. S.D.N.Y. 2023) (recognizing that "the right to timely payment of rents constitutes an interest in property entitled to adequate protection," and the court may lift the stay for the failure to pay post-petition rent).

The movant needs only "make a prima facie showing that it is entitled to relief from stay." *Schuessler*, 386 B.R. at 479. "Without quantifying the decline in value," the movant "can often establish its prima facie case by demonstrating that the debtor has completely failed, or substantially failed, to make post-petition payments." *In re Elmira Litho, Inc.*, 174 B.R. 892, 903 (Bankr. S.D.N.Y. 1994). Once the movant establishes a prima facie case, the burden shifts to the debtor—or the party opposing relief—to show that cause does not exist to lift the stay. *See Schuessler*, 386 B.R. at 480; *In re Eatman*, 182 B.R. 386, 390 (Bankr. S.D.N.Y. 1995) ("While section 362(g) allocates the burden of ultimate persuasion, under either ground, the movant must still make a prima facie showing that it is entitled to the relief that it seeks."); *see also* 11 U.S.C. § 362(g) ("[T]he party requesting [stay] relief has the burden of proof on the issue of the debtor's equity in property; and … the party opposing such relief has the burden of proof on all other issues.").

### 2. The Parties' Arguments

The Bank seeks relief from the automatic stay on the ground that its lien on the Property is not adequately protected. (Dkt. No. 40). The Bank holds a mortgage with a principal balance of

$901,600. (*Id.* ¶ 5). As of November 2025, the outstanding indebtedness is $401,275.38.[3] (*Id.* ¶ 8). The Property is valued at approximately $2,700,000. (*Id.* ¶ 15).

Although the Bank concedes that it is oversecured, it asserts that the Debtor and Ms. Wolfson have failed to make six post-petition mortgage payments. (*Id.* ¶ 13). According to the Bank, that failure alone constitutes cause to lift the stay and establishes a lack of adequate protection under § 362(d)(1). (*Id.*). The Bank further notes that no replacement liens, periodic cash payments, or other "indubitable equivalent" have been provided to protect against any potential diminution in the value of its collateral. (*Id.*).

The Debtor opposes the motion, arguing that the Bank's lien is adequately protected by a "substantial equity cushion." (Dkt. No. 52, ¶ 11). Based on a property value of $2,700,000 and an outstanding debt of $401,275.38, the Debtor contends that there is more than $2.2 million in equity securing the Bank's claim—far exceeding the "comfortable margin" required under the case law. (*Id.*). The Debtor further argues that the post-petition arrears are attributable to Ms. Wolfson's obstruction of his efforts to reorganize and to sell the Property. (*Id.* ¶ 7).

Ms. Wolfson also objects. (Dkt. No. 54). She echoes the Debtor's argument that the Bank is fully secured by a substantial equity cushion, emphasizing the disparity between the $401,275.38 debt and the $2,700,000 property value. (*Id.* ¶ 3). She further asserts that she and her daughter continue to reside at the Property, and that granting stay relief would unduly prejudice her as a non-debtor occupant. (*Id.* ¶ 10). To the extent the Bank seeks payment of post-petition arrears, Ms. Wolfson contends that the Debtor alone bears responsibility for mortgage payments pursuant

---

[3]      The Debtor's schedules reflect that, as of the petition date (August 21, 2025), the outstanding indebtedness secured by the Property was $437,850.00. (Dkt. No. 1, Schedule D). The Debtor's schedules do not separately identify the original principal balance of the mortgage loan. According to the Bank's Stay Relief Motion, the mortgage had an original principal balance of $901,600.00, and as of November 14, 2025, the total indebtedness owed to the Bank was $401,275.38. (Dkt. No. 40, ¶¶ 5-8).

to the multiple orders entered in the Matrimonial Proceeding—orders with which, she asserts, the Debtor has failed to comply.  (*Id*. ¶¶ 5-15).

### 3.   The Record Reflects That the Bank's Lien Is Adequately Protected

The Court finds that the Bank's security interest in the Property is adequately protected. The Bank has demonstrated that six post-petition mortgage payments are in arrears.  (Dkt. No. 40, ¶ 13).  A debtor's failure to make required post-petition payments ordinarily constitutes cause under § 362(d)(1) and is often a paradigmatic "example of a lack of adequate protection."  *In re Reyes*, 651 B.R. 99, 140 (Bankr. S.D.N.Y. 2023); *see also Schuessler*, 386 B.R. at 481.  The Bank has therefore satisfied its prima facie burden of demonstrating potential cause.

The inquiry, however, does not end there.  Courts also assess the debtor's "equity cushion" in the property, defined as "the value of the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect."  *Schuessler*, 386 B.R. at 480 (citing *In re Heath*, 79 B.R. 616, 618 (Bankr. E.D. Pa. 1987)); *see also In re Zinke*, No. 887-71461-20, 1989 WL 113154, *3 (E.D.N.Y. June 9, 1989).  Courts typically find inadequate protection where the equity cushion is insufficient or nonexistent.  *See In re Boodrow*, 126 F.2d 43, 53 (2d Cir. 1997); *see also In re Indian Palms Assocs., Ltd*., 61 F.3d 197, 207 (3d Cir. 1995) (finding adequate protection where the "value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim").

Here, the Property's value exceeds the Bank's claim by a wide margin.  The record reflects that the Bank's claim, with an outstanding balance of $401,275.38, is secured by property valued at approximately $2,700,000.  (Dkt. No. 40).  The collateral value exceeds the debt by more than $2.2 million.  (*Id*.).  In *Health*, the court calculated the debtor's equity cushion by subtracting the

secured creditor's lien from the appraised fair market value and dividing that figure by the property's value. *See Health*, 79 B.R. at 618 n.3. Applying that methodology, the *Health* court found a 35% equity cushion—"higher than many of the equity cushions discussed in the case law"—that was sufficient to constitute adequate protection. *Id*. at 618-19. Here, the equity cushion is approximately 85%. This is more than double the cushion deemed sufficient in *Health* and far beyond the "comfortable margin" recognized as adequate in the Second Circuit. *See id*.; *see also Boodrow*, 126 F.3d at 53.

An equity cushion of this magnitude protects the Bank against any realistic risk of diminution in collateral value during the pendency of the stay. While courts do not "engage in the mechanistic exercise of comparing cushions" and instead assess "cause" under the totality of the circumstances, an 85% equity cushion is substantial. *Health*, 79 B.R. at 618. Courts routinely deem far smaller cushions sufficient. *See, e.g.*, *In re Han*, No. 25-12126 (JPM), 2026 WL 184461, at *4 (Bankr. S.D.N.Y. Jan. 23, 2026) (describing a 30% equity cushion as "substantial"); *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (explaining that "an equity cushion of 20% or more constitutes adequate protection," while "an equity cushion under 11% is insufficient to provide adequate protection"); *In re James River Assoc*., 148 B.R. 790, 796 (E.D. Va. 1992) (holding that a 2% equity cushion is insufficient to provide adequate protection). Even in contexts where courts have required larger cushions—such as vacant land subject to rapid value diminution—cushions in the range of 40% to 50% have been deemed sufficient. *See In re Hutton-Johnson Co., Inc*, 6 B.R. 855, 859 (Bankr. S.D.N.Y. 1980).

Where the equity cushion is substantial, courts have repeatedly held that its existence may, "in and of itself, constitute adequate protection." *In re AMR Corp*., 490 B.R. 470, 478 (S.D.N.Y. 2013) (citing *In re Fortune Smooth (U.S.) Ltd*., No. 93-4090 (JLG), 1993 WL 261478, at *6 (Bankr.

S.D.N.Y. July 6, 1993)); *see also In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) ("In fact, it has been held that the existence of an equity cushion, standing alone, can provide adequate protection."); *Elmira Litho*, 174 B.R. at 904 ("An equity cushion, therefore, provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case."); *In re Johnston*, 38 B.R. 34, 36 (Bankr. D. Vt. 1983) ("It is well settled that an 'equity cushion' or 'value cushion' in and of itself may provide adequate protection for a secured creditor."). In such circumstances, courts have declined to lift the stay notwithstanding post-petition payment defaults. *See, e.g.*, *In re Singh*, No. 25-10431 (JPM), 2025 WL 2315415, at *4 (Bankr. S.D.N.Y. Aug. 11, 2025); *Health*, 79 B.R. at 618.

In addition to the size of the equity cushion, courts also consider: (1) the rate at which the equity cushion is eroding; (2) whether periodic payments may offset that erosion; (3) the likelihood of a reasonably prompt sale; (4) the debtor's prospects for successful reorganization; and (5) the availability of alternative protection for the creditor. *See, e.g.*, *In re Liona Corp.*, 68 B.R. 761, 768 (Bankr. E.D. Pa. 1987); *In re Grant Broadcasting*, 71 B.R. 376, 387 (Bankr. E.D. Pa. 1987); *Sanders v. Tucker (In re Tucker)*, 5 B.R. 180, 182 (Bankr. S.D.N.Y. 1980). Here, the Bank does not allege that the Property is declining in value, that it is unmarketable, or that the cushion is rapidly eroding. On this record, the existence of an 85% equity cushion alone provides the Bank with adequate protection.

Accordingly, in light of the substantial equity cushion, the Court concludes that "cause" does not exist to lift the stay to permit foreclosure under § 362(d)(1). The Bank has not demonstrated any present risk of diminution in the value of its collateral.

To the extent the parties dispute whether the Debtor alone bears responsibility for curing the post-petition arrears pursuant to the New York Court's orders, that issue need not be resolved

at this time.  *See In re Taub*, 427 B.R. 208, 223 (Bankr. E.D.N.Y.  2010) (holding that the state matrimonial court was the more appropriate forum to determine whether the debtor's estranged spouse complied with state court orders requiring payment of property-related expenses).  That question is more appropriately addressed, in the first instance, in the Matrimonial Proceeding, which this Court has permitted to continue.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that: (1) retention of a real estate broker under 11 U.S.C. § 327 is unwarranted; (2) "cause" exists to lift the automatic stay to permit Ms. Wolfson to resume the Matrimonial Proceeding; and (3) the Bank has failed to demonstrate "cause" for relief from the automatic stay to proceed with foreclosure against the Property.  Accordingly, it is hereby ordered that:

1.  The Retention Motion (Dkt. No. 24) is **DENIED**.

2.  Ms. Wolfson's Stay Relief Motion (Dkt. No. 39) is **GRANTED**.

3.  The Bank's Stay Relief Motion (Dkt. No. 40) is **DENIED**.

**IT IS SO ORDERED**.

Dated: March 9, 2026
New York, New York                  /s/ John P. Mastando III
                                    HONORABLE JOHN P. MASTANDO III
                                    UNITED STATES BANKRUPTCY JUDGE